**Exhibit J**
**Deposition of Anthony Longinotti**

17

1    Q    Where did you go to high school?
2    A    Hot Springs High School.
3    Q    Did you graduate?
4    A    Yes.
5    Q    And what year did you graduate?
6    A    1969.
7    Q    Did you pursue any schooling after high
8    school?
9    A    Yes. I attended Arkansas Tech College in
10   Russellville, Arkansas and graduated in 1973.
11   Q    What degree did you graduate with?
12   A    Sociology and psychology.
13   Q    Was that a bachelor's degree?
14   A    Yes.
15   Q    Any other schooling?
16   A    I attended graduate school at the
17   University of Arkansas in Fayetteville for a year
18   and a half.
19   Q    What year and a half? When did you go
20   there?
21   A    I started in '74 and left just at the end
22   of '75.
23   Q    What were you pursuing, a --
24   A    Master's degree in sociology.
25   Q    Did you obtain that degree?

18

1    A    No.
2    Q    Why not?
3    A    I went to work.
4    Q    You decided you would rather be working
5    than going to school?
6    A    Yes.
7    Q    Did you leave school on your own accord?
8    A    Yes. I completed all the coursework, I
9    just didn't complete my master's thesis.
10   Q    Where did you go to work after that in
11   1975?
12   A    Department of Social Services in Fort
13   Smith, Arkansas.
14   Q    What was your job there?
15   A    I was a case examiner.
16   Q    Any other education?
17   A    Off and on for the last 34 years, various
18   seminars. I have claim certifications in several
19   states.
20   Q    What's claim certifications?
21   A    I have a multiline adjustors license for
22   the state of Arkansas.
23   Q    I'm sorry, what kind of adjustors license?
24   A    Multiline adjustors license.
25   Q    What does that mean?

19

1    A    That means I'm licensed to handle
2    property, casualty, surety and workers' compensation
3    claims by the state insurance department.
4    Q    And you said you have that in multiple
5    states?
6    A    Yes.
7    Q    Which states?
8    A    Florida -- these are not current. I've
9    held them at one time in Florida, Georgia,
10   Louisiana, Tennessee, New Mexico, South Carolina,
11   North Carolina, Pennsylvania. Did I say Oklahoma?
12   Q    No.
13   A    Okay.
14   Q    And Arkansas?
15   A    And Arkansas.
16   Q    Besides Arkansas -- is Arkansas current?
17   A    Yes.
18   Q    Any of the other ones still current?
19   A    No. Arkansas is the only one that I have
20   currently.
21   Q    You said you attended various seminars,
22   what type of seminars?
23   A    Arson investigation, accident
24   reconstruction, casualty investigation, workers'
25   compensation administration.

20

1    Q    Anything else?
2    A    I'm sure there were specialty seminars
3    I've attended over the years, but I can't recall
4    exactly what they are at the present.
5    Q    Did you receive any certifications from
6    these seminars?
7    A    I think you received a certificate or
8    continuing education credits.
9    Q    But no sort of certificate of higher
10   education?
11   A    I do have a master's certificate from the
12   Department of Transportation in safety compliance
13   regulations that's current and I'm a current member
14   of the Transportation Industry Defense Association
15   as an industry member, the Northwest Arkansas Risk
16   Managers Association.
17   Q    Okay. Any other education that we haven't
18   talked about?
19   A    I think that's enough.
20   Q    Did you serve in the military?
21   A    No.
22   Q    Who is your current employer?
23   A    P.A.M. Transport, Inc.
24   Q    What is your title there?
25   A    Director of risk management.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

TONY LONGINOTTI                                                September 28, 2010

25

1    A   Yes.
2    Q   What's your current salary?
3    A   78,000, I believe.
4    Q   Do you receive benefits?
5    A   Health, some life insurance coverage,
6    401(k) and free coffee.  Can I get some more?
7        MR. HOWLETT:  Yeah.
8    Q   (BY MS. GIBBS)  You said that you
9    supervised the medical compliance department?
10   A   Yes.
11   Q   Have you done that since 2004?
12   A   Yes.
13   Q   Are you familiar with the policies and
14   procedures of the medical compliance department?
15   A   Yes.
16   Q   What is your day to day involvement in the
17   medical compliance department?
18   A   Like the other departments, you know, I'm
19   available for consultations.  If there's issues that
20   are unclear as far as policy decisions or decisions
21   to be made, then I will be contacted by the medical
22   compliance manager.
23   Q   Who works under you in the medical
24   compliance department?
25   A   Janice Brown is the department manager.

26

1    Debbie Perry is the drug and alcohol random
2    supervisor.  She also works under that department's
3    banner.  Amanda Karras, K-a-r-r-a-s, is an assistant
4    to Debbie Perry.  Leah Wallace does medical review,
5    Melissa Priest also does medical review.  Beverly
6    Godfirnon, G-o-d-f-i-r-n-o-n, does medical review
7    and appointment scheduling and billing oversight.
8    Q   Anyone else?
9    A   No.
10   Q   Does Janice Brown or any of the other
11   medical review personnel ever come to you regarding
12   whether a driver should be put on medical hold or
13   should be released from medical hold?
14   A   On occasion.
15   Q   When would they come to you about that?
16   A   If they just had a question in general as
17   far as did it meet our internal policy or federal
18   compliance issues.
19   Q   So they would come to you if they did not
20   know what P.A.M.'s internal policy was?
21   A   They could.
22   Q   Or a DOT policy?
23   A   Yes.
24   Q   What other types of policies would they
25   come to you regarding?

27

1    A   That's about the breadth of our policies.
2    Q   Anything else that they would come to you
3    about?
4    A   Are you talking about their personal
5    issues?
6    Q   Not their personal issues, just for work.
7    A   My opinion, they come to me too much, but
8    not for that.  It just, you know, on a daily basis
9    it's a close office so we're in contact quite a bit.
10   Q   For what other types of work-related
11   issues do they come to you about?
12   A   They may want to complain about what
13   somebody's wearing.
14   Q   Okay.  Anything else?
15   A   Women issues.
16   Q   Anything else?
17   A   No.
18   Q   What time do you usually get in in the
19   morning?
20   A   About 7 a.m.
21   Q   What time do you usually leave?
22   A   About 5 p.m.
23   Q   You usually leave by five every day?
24   A   Yes.
25   Q   You work out of the location in Tontitown?

28

1    A   Yes.
2    Q   Is that how you pronounce it?
3    A   Tontitown.
4    Q   Tontitown.  Too many T's in there.
5    A   I know.  I always thought it was Tonitown
6    until I moved up here.
7    Q   Have you ever been disciplined or given a
8    negative performance review?
9    A   No.
10   Q   What type of training do you have for your
11   job as the director of risk management?
12   A   1978 I started out with General Adjustment
13   Bureau as a claims investigator.  I went through
14   their six week training course in Denver and I
15   believe there was a couple of other two-week
16   advanced courses at their training center in Denver
17   I also attended.  In 1981 I opened up an independent
18   claims office and ran that for eight years as an
19   independent adjustor.  I then went to work for
20   Maryland Casualty as a claims manager until '90 -- I
21   believe '90.  I then worked at Arkansas Best
22   Corporation as a workers' compensation supervisor.
23   Then in '96 to USA Truck as director of risk
24   management and that's my current position.
25   Q   When you came to P.A.M. in 1994 as a risk



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

41

1  the case?
2      A    The case has been on my desk since the
3  charge was filed so I have -- with the discovery
4  requests coming in, I'm usually involved in the case
5  almost on a daily basis.
6      Q    What are the documents you reviewed in
7  preparation for your deposition today?
8      A    That was it.
9      Q    Only the deposition transcripts?
10     A    Yes.
11     Q    Those are the only documents you reviewed?
12     A    In preparation for today, yes.  Oh, excuse
13  me, there was some medical screens that I did
14  review.
15     Q    What medical screens did you review?
16     A    I can't say specifically.  They were
17  medical screens on some other drivers.
18     Q    Do you remember these drivers' names?
19     A    No.
20     Q    Do you remember what the facts in those
21  medical screens were?
22     A    Some of the issues were on medication they
23  were taking.
24     Q    Do you remember what type of medication?
25     A    Vicodin, I believe.

42

1      Q    Anything else?
2      A    Not that I can recall.
3      Q    Any other documents besides some medical
4  screens and the deposition transcripts?
5      A    Yes.
6      Q    Those are all?
7      A    Yes.
8      Q    Okay.  You said you prepared with your
9  attorney, Mr. Howlett, correct?
10     A    Correct.
11     Q    Did you meet with Mr. Howlett?
12     A    Yes.
13     Q    When did you meet with Mr. Howlett?
14     A    Yesterday.
15     Q    How long?
16     A    Approximately two hours.
17     Q    During those two hours, did Mr. Howlett
18  show you any documents?
19     A    Yes.
20     Q    What documents did he show you?
21     A    He showed me the medical screen documents I
22  just referred to.
23     Q    Did he show you any other documents?
24     A    I don't believe so.
25     Q    Did you meet with Mr. Howlett any other

43

1  time?
2      A    Briefly this morning.
3      Q    How long this morning?
4      A    About ten minutes.
5      Q    During that time, did he show you any
6  documents?
7      A    No.
8      Q    Have you spoken to Mr. Howlett regarding
9  your deposition?
10     A    Yes.
11     Q    When did you speak to him last other than
12  what we just talked about?
13     A    When he told me it was scheduled.
14     Q    Okay.  Don't tell me anything that he told
15  you.  I don't want to know what you guys talked
16  about, I just want to know when.
17     A    As soon as we received the notice for
18  deposition, he informed me as to when it would be
19  and make sure that the calendar was clear.
20     Q    Okay.  Any other discussions you had with
21  Mr. Howlett?
22     A    Just discovery requests.
23     Q    What about with Ms. Miller?
24     A    The same.
25     Q    Anybody else at Dickinson Wright that you

44

1  have met with or spoken to?
2      A    No.
3      Q    Just Ms. Miller and Ms. Howlett?
4      A    (Witness shakes head negatively.)
5          MR. HOWLETT:  Did you say Ms. Howlett?
6      Q    (BY MS. GIBBS) Oh, sorry.  Mr. Howlett.
7  I'm sorry.  Janice Brown in her deposition testified
8  that P.A.M. combined all of its subsidiaries such as
9  Decker under one name; is that correct?
10     A    That's correct.
11     Q    When did that happen?
12     A    I believe in February of 2010.
13     Q    So prior to February of 2010, all the
14  subsidiaries were operating under their previous
15  names?
16     A    Correct.
17     Q    And so until February of 2010 Decker
18  Transport was still operating as Decker Transport?
19     A    Yes.
20     Q    If you turn to page nine on Exhibit 1.
21     A    Okay.
22     Q    Okay.  Interrogatory number 11, it says,
23  "State the number of employees currently working for
24  defendant."  And then it says, "Defendant closed its
25  operations in 2009."  Why does it say that?



Toll Free: 800.866.5560
Facsimile: 248.205.7040

ESQUIRE
an Alexander Gallo Company

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

TONY LONGINOTTI                                    September 28, 2010

45

1    A   I believe that's when the Decker terminal
2    was shut down and that was a general layoff.
3    Q   What Decker terminal?
4    A   It's the New Jersey terminal. I've just
5    drawn a blank on the city location at this point,
6    but it was a general terminal shutdown I believe
7    occurred in December and then in February the
8    decision to bring all the subsidiaries under one
9    title were made.
10   Q   Did you shut down all the Decker terminals
11   in 2009?
12   A   In New Jersey, yes.
13   Q   Did you shut down the Decker terminal in
14   Ohio in 2009?
15   A   No.
16   Q   Did you shut down the Decker terminal in
17   Illinois in 2009?
18   A   I don't believe we had a Decker terminal
19   in Illinois.
20   Q   There was not a Decker terminal in Breese,
21   Illinois?
22   A   There's a maintenance shop in Breese,
23   Illinois.
24   Q   Were those shut down in 2009?
25   A   I believe they were shut down later in

46

1    2010.
2    Q   Okay. So Decker did not close its
3    operations in 2009, you're just saying that Decker
4    closed a terminal in New Jersey in 2009?
5    A   That's correct.
6    Q   Okay. So this answer to the interrogatory
7    is incorrect?
8    A   The location where Anita Phillips was
9    dispatched from and Pat Smith worked along with
10   Eileen Bennett, that was closed in 2009.
11   Q   Okay. But Defendant Decker Transport was
12   still in operation in 2009?
13   A   Through the end of 2009 in name.
14   Q   Until 2010?
15   A   Correct.
16   Q   Okay. So the answer to this interrogatory
17   is incorrect?
18   A   That's your opinion.
19   Q   Pat Smith, Carl Russell, Joyce Farissier,
20   Eileen Bennett all testified that the terminal in
21   Parsippany, New Jersey actually shut down in
22   December of 2007 when they were all laid off.
23   A   That could be right. That's not part of
24   my area of operation.
25   Q   Okay. Well, you just testified that the

47

1    reason that this says defendant closed its
2    operations in 2009 is because that's when the
3    terminal in New Jersey was closed, but they all
4    testified that had been closed two years earlier?
5    A   They could be more correct.
6    Q   Okay. So now I'm asking you again why
7    this says defendant closed its operations in 2009?
8    A   My memory is not what it used to be.
9    Q   So if Decker closed the New Jersey
10   terminal in 2009 -- or in 2007, I'm sorry, and
11   Decker Transport was still operating until it became
12   combined under the P.A.M. -- until P.A.M. combined
13   all their subsidiaries under one name in February of
14   2009, then this answer that says defendant closed
15   its operation in 2009, is that incorrect?
16   A   That could be incorrect. I wasn't
17   involved in operational procedures regarding the
18   terminal closings.
19   Q   Okay. But you were involved in
20   preparation for the answers to these
21   interrogatories?
22   A   That's correct. That was probably from
23   best memory.
24   Q   So you did not do anything to verify the
25   answer to this interrogatory was correct?

48

1    A   Just dependent upon my memory.
2    Q   Okay. So in February of 2010 you combined
3    all the subsidiaries under P.A.M. Transport?
4    A   I believe that's correct.
5    Q   What were the names of all the
6    subsidiaries?
7    A   AFS, which is Alan Freight Services.
8    Q   Uh-huh.
9    A   PDS, P.A.M. Dedicated Services; CEX, which
10   is Choctaw Express, Inc;, the Decker facility in
11   Ohio; TTX in Irving, Texas and I believe that's it.
12   Q   Prior to 2010, Decker was a wholly owned
13   subsidiary of P.A.M. Transport, correct?
14   A   Correct.
15   Q   And all of the employees of Decker were
16   employees of P.A.M. Transport, correct?
17       MR. HOWLETT: I'm going to object. It
18   calls for a legal conclusion.
19   A   I don't know how they actually -- where
20   their payroll was allocated, if it was allocated
21   under Decker or P.A.M.
22   Q   (BY MS. GIBBS) But Decker was a wholly
23   owned subsidiary of P.A.M. Transport, correct?
24   A   Yes.
25   Q   Were all the other, AFS, PDS, CEX and TTX,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

49

1  also wholly owned subsidiaries of P.A.M. Transport?
2      A   Yes.
3      Q   And was Decker?
4      A   Yes.
5      Q   Okay.  So the only real change in
6  February of 2010 is that instead of being called by
7  all these various names, now all these companies
8  were called P.A.M. Transport?
9      A   That's correct.
10     Q   Any other substantial change that was made
11 in February of 2010?
12     A   No.
13     Q   Okay.  Were all the drivers and employees
14 of all these subsidiaries including Decker regulated
15 under the same policies and procedures?
16     A   Yes.
17     Q   Did any drivers get laid off as a result
18 of the name change?
19     A   I believe the Florida operation, which is
20 Alan Freight Services, I believe some of those
21 drivers were laid off.
22     Q   Any other drivers that were laid off?
23     A   Not that I'm aware of.
24     Q   Were any drivers laid off when you closed
25 the Decker facility in New Jersey?

50

1      A   I believe they all transferred, the ones
2  that wanted to.
3      Q   Is the Willard, Ohio terminal, what was
4  Decker Transportation is now P.A.M. Transportation,
5  is that still open?
6      A   Yes.
7      Q   It's just operating as P.A.M.
8  Transportation now?
9      A   Yes.
10     Q   Is the Breese, Illinois maintenance shop
11 still open?
12     A   No, I believe it closed about four or five
13 months ago.
14     Q   Are there any other facilities that used
15 to be Decker Transport that are now P.A.M. Transport
16 that are still open?
17     A   I don't believe so.
18     Q   So only Willard, Ohio is still open?
19     A   Yes.  Excuse me, North Jackson, Ohio also
20 is open.
21     Q   What was in North Jackson, Ohio?
22     A   That's a terminal facility and shop.
23     Q   Similar to New Jersey and Willard?
24     A   I have never seen those locations.
25     Q   And that used to be a Decker?

51

1      A   I believe it was.
2      Q   Do you have any sort of medical training?
3      A   First aid.
4      Q   Anything else?
5      A   No.
6      Q   Have you ever received any training in DOT
7  medical regulations?
8      A   Yes.
9      Q   What sort of training?
10     A   As referenced earlier, I have a master's
11 certificate in Department of Transportation safety
12 compliance management.
13     Q   What year did you receive that again?
14     A   2009.
15     Q   Prior to 2009, did you have any training
16 in DOT medical regulations?
17     A   Just reviewing the regulations as part of
18 the job for approximately 20 years.
19     Q   So just reading the regulations and
20 becoming familiar with them on your own?
21     A   Yes.
22     Q   This master's certification that you
23 received in 2009, did you have to go to a class or a
24 series of classes to receive it?
25     A   It was online correspondence.

52

1      Q   Was it through a university, was it
2  through the DOT?
3      A   I believe it was through the Arkansas
4  Trucking Association's website.
5      Q   And what did you have to do?
6      A   There was several subsections of the
7  regulations that covered everything from hours of
8  service, drug and alcohol testing to medical
9  compliance, driver fitness and I think there was
10 approximately 60 separate exams associated with it
11 that I had to complete.
12     Q   60 exams?
13     A   It seemed like 60.
14     Q   How long did it take?
15     A   About a month.
16     Q   Did you have more than one exam a day?
17     A   Yes.
18     Q   How often would you take the classes and
19 take the exams?
20     A   Probably every other day.
21     Q   Were the exams relatively short?
22     A   It didn't seem like it.
23     Q   So every other day how much of your time
24 were you spending doing this?
25     A   A couple of hours.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

ESQUIRE
An Alexander Gallo Company

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

TONY LONGINOTTI                                             September 28, 2010

57

1  on, they are on a 90 day probation period and during
2  that probation period they're under the direct
3  supervision of Janice Brown and myself.
4      Q   When you say direct supervision, what does
5  the direct supervision entail?
6      A   It's mainly just getting them comfortable
7  with the department protocol, our mainframe system
8  as to what screens they need to use and how to
9  properly document their files and recommendations.
10     Q   Any other training that they receive?
11     A   No.
12     Q   Do they ever have to receive any sort of
13  certifications?
14     A   Debbie Perry has to be certified as far as
15  her collections protocol. Our workers' compensation
16  administrator carries a current license. I carry my
17  current license and I don't know offhand if any
18  other persons in the department have a license of
19  any type.
20     Q   Okay. Do all the P.A.M. companies,
21  subsidiaries that we discussed, have the same
22  medical policy?
23     A   Yes.
24     Q   Who teaches the medical policy to the
25  drivers?

58

1      A   The policies are memorialized in the
2  driver's handbook. I believe in the employee's
3  handbook also there's references. All drivers go
4  through an orientation process. Part of that
5  process is a representative of the medical -- or the
6  risk management department will address the new
7  hires as far as some of the highlights of how they
8  need to interact with the medical compliance
9  department.
10     Q   During the orientation, do all the drivers
11  come to Arkansas?
12     A   At one time they did, but I cannot give
13  you the dates.
14     Q   Okay.
15     A   Now there is some actual orientation being
16  done in the field.
17     Q   In 2007 did the drivers come to Arkansas?
18     A   I can't recall specifically.
19     Q   This -- was there somebody from risk
20  manager or medical compliance?
21     A   If the orientation was done outside of
22  Arkansas at a terminal location, it would have been
23  performed by a safety supervisor.
24     Q   Okay. If the safety supervisor does the
25  medical training for the drivers, what does it

59

1  consist of?
2      A   Just explained the overall policies that
3  are in the handbook, what is required of a driver as
4  far as DOT regulations regarding driver fitness.
5  They're advised as to what the procedure is if they
6  take medical leave or have to seek treatment from a
7  licensed health care professional.
8      Q   How long does the training about the
9  medical compliance last?
10     A   I think they allocate about a 45 minute
11  period during orientation.
12     Q   They receive -- they go to receive medical
13  treatment, what are they told in training regarding
14  using the medical treatment?
15     A   If they're seeking medical treatment, then
16  they need to -- the preferable procedure is they
17  contact the medical compliance department prior to
18  receiving the treatment or the visit so to alert
19  them to the fact that they are going to be seeking
20  treatment and then we ask for some type of
21  documentation from the provider as to the reason for
22  the visit to make sure that they're in compliance
23  with the regulations.
24     Q   You require something in writing from the
25  doctor?

60

1      A   Normally, yes.
2      Q   Normally, but not always?
3      A   If they go in for an eye exam, we may not
4  require an actual document from the doctor.
5      Q   Anything else that you wouldn't require a
6  note, something in writing from the doctor?
7      A   You know, it's kind of on a case by case
8  basis depending on what the issue is.
9      Q   So the personnel in medical compliance can
10  use their discretion as to whether or not they will
11  require something in writing?
12     A   Yes.
13     Q   If they do require a note, what should the
14  note have in it?
15     A   We would prefer that it addresses any type
16  of prescriptions that the driver has been given and
17  an overall statement as to their ability to return
18  to work. Also, whether or not there's a request for
19  referral.
20     Q   And if the doctor's note says that they're
21  able to return to work and they were not given a
22  drug that is not allowed to be taken while they're
23  driving, someone in medical compliance will then
24  allow them to return to work?
25     A   Not necessarily.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

TONY LONGINOTTI                                                September 28, 2010

61

1    Q   Okay. In a situation like that, when
2    would -- why would they not be allowed to return to
3    work?
4    A   Well, there's -- you know, not all medical
5    providers are familiar with the Department of
6    Transportation compliance requirements. We don't
7    make medical decisions, but we do make compliance
8    decisions. So a doctor could treat a driver for a
9    condition that he may not realize is disqualifying
10   and would go ahead and indicate to the driver that
11   he is okay to return to work, but they would be out
12   of compliance with DOT.
13   Q   So if it's a condition that is
14   disqualifying under DOT policies, even though the
15   doctor says they're okay to return to work, you may
16   not allow them to return to work?
17   A   That's correct.
18   Q   Any other reason?
19   A   That's the majority reason.
20   Q   Is there any other reason?
21   A   No. You know, our issue is, you know, do
22   we think that the driver is safe to operate the
23   commercial motor vehicle.
24   Q   Okay. But if a doctor says they're safe
25   -- okay. I'm trying to figure out how to word this

62

1    correctly. If they are not given a prescription
2    that is -- that they are not allowed to drive on and
3    they are not being treated for a condition that is
4    regulated by the DOT and the doctor says that
5    they're safe to return to work, would you then allow
6    the driver to return to work?
7    A   Not necessarily. If a driver complained
8    of dizziness and went to an ER physician and the ER
9    physician said your blood pressure is 195 over 142,
10   I'm not prescribing medicine now, follow up with
11   your regular provider, you're okay to drive, he
12   would not be allowed. He would be out of compliance
13   with motor carrier regulations on blood pressure.
14   Q   Okay. But that's what we just -- but
15   if -- what I just said was that if they were not
16   given a prescription that they were not allowed to
17   drive on and if they did not have a condition that
18   disqualified them from driving under DOT regulations
19   and the doctor said they were okay to return to
20   work, would they then be allowed to return to work?
21   A   There would be a judgment call. Probably
22   most cases they would be allowed to.
23   Q   Okay. So you're saying there would be a
24   judgment call on behalf of somebody in medical
25   compliance?

63

1    A   True. But if the release indicates or the
2    documentation indicates no disqualifying medication,
3    not an obvious disqualifying medical condition,
4    other than issues of safety concerns there wouldn't
5    be a reason to keep a driver out of service.
6    Q   When you say other than the reasons of
7    safety concerns, what do you mean? What would the
8    safety -- if all those conditions were present, that
9    they weren't given a disqualifying drug and they
10   didn't have a disqualifying condition, what else
11   would prevent them from returning to work?
12   A   In some cases the drivers themselves will
13   be requested to be taken out of service because they
14   just don't feel well. During the flu season that's
15   quite a common event. They will be put on a medical
16   hold strictly on the basis of their call to us that
17   they are indicating they don't feel safe to operate.
18   Q   Okay. What if the driver is ready to
19   return to work, is there any reason that medical
20   compliance would not clear them to return to work?
21   A   If they are given a release from the
22   physician, we're confident the physician is familiar
23   with DOT requirements, there's no obvious
24   disqualifying conditions, if the driver feels safe
25   to operate, they would probably be cleared to drive.

64

1    Q   Okay. So no disqualifying drugs, no
2    conditions that are disqualifying under the DOT and
3    the driver feels safe to drive, then medical
4    compliance should clear them to return to work,
5    correct?
6    A   I think it would be a reasonable
7    assumption.
8    Q   Okay. What is the purpose of requiring
9    the written release?
10   A   It's one of the only ways that we can
11   document actually what the condition the driver was
12   treating for and that the doctor actually did the
13   examination and their medical recommendations.
14   Q   You can't just take the driver's word?
15   A   No.
16   Q   Do you only require a note when they visit
17   a doctor?
18   A   There are conditions that they can furnish
19   documentation without visiting a doctor, such as a
20   smart card in their CPAP machine, which is for sleep
21   apnea issues.
22   Q   Okay.
23   A   And it will show that one of the issues
24   with sleep apnea is that are they using the CPAP
25   machine as prescribed. A smart card records the



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

TONY LONGINOTTI                                    September 28, 2010

81

1   scene, if you have a driver who is not safe to
2   drive, may have a condition such as syncope where he
3   would become unconscious, it obviously has a large
4   impact on the driver safety as to whether or not
5   he's going to survive.
6       Q   So about their safety while they're
7   driving?
8       A   Right.
9       Q   The same about the welfare of the public
10  in general?
11      A   Correct.
12      Q   If you're in a truck accident and you hit
13  something else?
14      A   Truck accidents are fairly catastrophic in
15  nature.
16      Q   What DOT guidelines was this policy
17  established to comply with?
18      A   I believe it's section 392 of the Federal
19  Motor Carrier Regulations that addresses driver
20  fitness and medical qualifications.
21      Q   Anything else, any other DOT guidelines?
22      A   I think that's the majority.
23      Q   Any other DOT guidelines?
24      A   Well, there's several hundred pages in the
25  DOT guidelines and a lot of it addresses driver

82

1   fitness and qualifications, but 392, I believe, is
2   the governing section on medical qualifications.
3       Q   And as it says the internal criteria of
4   the medical compliance department, what medical --
5   what internal criteria of the medical compliance
6   department is this protocol established to comply
7   with?
8       A   Well, that could be where we have, you
9   know, asked about the over-the-counter medications.
10  Part of the process when a student does come through
11  after the post offer has been made is they will fill
12  out a questionnaire at the medical examiner's office
13  that does ask them any use of over-the-counter
14  medication, current use, if they've had prior
15  workers' compensation claims, service related
16  disabilities and that's an internal policy.
17      Q   Okay. But the policy of reporting medical
18  treatment and then being cleared through medical
19  compliance, that's the policy that's being discussed
20  in this paragraph, correct?
21      A   Yes.
22      Q   What internal criteria is that policy
23  established to comply with?
24      A   Our internal policies are meant to enhance
25  the Federal Motor Carrier Regulations and that

83

1   Federal Motor Carrier Regulations are minimum
2   standards to certify a driver and that also pertains
3   to health issues.
4       Q   Okay. What internal criteria is this
5   policy that we just read intended to comply with or
6   has this policy been established to comply with?
7       A   To put the safest driver on the road that
8   P.A.M. can possibly do.
9       Q   Any other internal criteria?
10      A   The primary guiding principles for our
11  medical compliance department is safety of the
12  driver and public interest.
13      Q   Any other specific internal criteria that
14  this policy has been established to comply with?
15      A   I'm not sure what you're asking.
16      Q   Okay. This sentence, the second to last
17  sentence says, "This protocol has been established
18  to," and then I will skip -- "Established to
19  compliance with DOT guidelines and internal criteria
20  of the medical compliance department." This
21  protocol is referring to the protocol that we read
22  previously, the protocol that requires drivers
23  report injury or illness or medical treatment and
24  then be cleared through medical compliance, correct,
25  that's the protocol that we're speaking about?

84

1       A   Okay.
2       Q   And then the sentence that we just
3   discussed says the reason for that -- the reason
4   that that protocol was established was partially to
5   comply with internal criteria of the medical
6   compliance department. So what I'm asking is what
7   internal criteria of the medical compliance
8   department was this protocol established to comply
9   with?
10          MR. HOWLETT: Objection, asked and
11  answered.
12          MS. GIBBS: He said he didn't understand
13  the question, though.
14          MR. HOWLETT: He had already given about
15  two answers on it. I think the question was
16  anything more, the one you --
17      Q   (BY MS. GIBBS) Go ahead.
18      A   Well, I think we do have more stringent
19  requirements for our drivers than what's mandated by
20  just the basic requirements of the DOT regulations
21  and those are what we consider our internal policies
22  and criteria. A driver that may pass a medical
23  examination and receive a certification may not pass
24  our company's more stringent policies.
25      Q   Okay. So I'm asking what those internal



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

TONY LONGINOTTI                                        September 28, 2010

85

1    criteria are?
2        A   It's a case-by-case basis. We don't have
3    anything specifically written down that our blood
4    pressure requirements are higher than DOT
5    regulations. Maybe in a situation where we would
6    look at past injury histories, drug and alcohol use.
7    There's nothing that allows -- that says that we
8    can't look at additional areas of concern from
9    safety that may be presented to us. So is there a
10   specific criteria written down, a list? No.
11       Q   So you're saying that you have more
12   stringent medical policies than is regulated by the
13   DOT, correct?
14       A   That's correct.
15       Q   But you're saying that those policies are
16   not written down anywhere?
17       A   No, those policies are something that if
18   this issue comes up it's discussed with the driver
19   and if there's an additional concern we may have our
20   medical review officer offer his opinion.
21       Q   So you allow your medical compliance
22   department to use their discretion as to when they
23   are going to implement policies that are more
24   stringent than what the DOT regulates?
25       A   From a compliance standpoint, yes.

86

1        Q   What do you mean from a compliance
2    standpoint?
3        A   Not from the medical, from the compliance,
4    from the DOT compliance standpoint.
5        Q   Okay. I'm just sort of confused. What
6    you're saying if I'm hearing this correctly is the
7    DOT has sort of base --
8        A   Correct.
9        Q   -- regulations?
10           And you're saying that you can employ more
11   stringent policies, correct?
12       A   That's correct.
13       Q   Than what the DOT requires for compliance?
14       A   Correct.
15       Q   But these policies, these more stringent
16   policies that you have are not written down
17   anywhere?
18       A   They are probably -- we refer to the
19   conference notes on some issues regarding the
20   medical conditions that may be presented. We do not
21   have a list that's just listed out as something that
22   I could produce that said this is a, you know,
23   condition that we're going to examine further.
24       Q   But you allow --
25       A   Well, as an example, sleep apnea is

87

1    probably in the near future is going to be part of
2    the public policy and regulations of the DOT and it
3    will probably be keyed off of body mass index, neck
4    size. It's one of the hot topics coming up now with
5    the Department of Transportation.
6            A driver may come through our department
7    and the medical examiner has put down no sleep
8    disorder, checked that. The driver tells us he
9    doesn't sleep, he knows he snores, he's always tired
10   and he never feels rested. In that case, we may
11   request additional documentation or testing before
12   we allow him on the truck.
13       Q   Even though the doctor said that they
14   didn't have it?
15       A   Correct.
16       Q   So even though the doctor said that they
17   didn't have a sleep disorder, you think that there
18   might be a sleep disorder?
19       A   If the driver admits to certain conditions
20   or situations, we would request that. We could
21   request that.
22       Q   But what I'm asking and I think it's sort
23   of what you -- is that your -- you have the base
24   level DOT regulations and you're allowed to have
25   more stringent policies. Your medical compliance

88

1    uses their discretion as to when they're going to
2    apply more stringent policy to a specific driver?
3        A   I believe that's the correct answer or
4    statement.
5        Q   And these more stringent policies, just to
6    clarify, you don't have these policies written down
7    in any form?
8        A   They're on a case by case basis depending
9    on what the condition is.
10       Q   Okay. Are there any other reasons for
11   this protocol besides those that are listed here?
12       A   I believe those are the highlights, just
13   driver welfare and public safety.
14       Q   And compliance with DOT?
15       A   And compliance, excuse me, and compliance
16   with DOT.
17       Q   Does Janice Brown have any medical
18   experience?
19       A   I believe that she has worked in some
20   medical administrative capacities or medical
21   clinics. I can't tell you specifically.
22       Q   Is she a doctor?
23       A   No.
24       Q   Is she a nurse?
25       A   No.



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

89

1  Q  Does she have any other medical training?
2  A  Other than her on-the-job training and
3  what she has developed over her position with P.A.M.
4  Q  Do you require your medical compliance --
5  or your medical review clerks have any medical
6  training?
7  A  We prefer it. It's not a requirement.
8  Q  What kind of medical training?
9  A  Anything that's medical terminology. In
10  Melissa's case, her nursing background, but
11  primarily their compliance concern is not medical.
12  We have a medical review officer to make medical
13  determinations.
14  Q  And whenever a medical determination is
15  needed -- who is the medical review officer?
16  A  Craig Cooper.
17  Q  Is he a doctor?
18  A  Yes.
19  Q  And whenever a medical review decision is
20  needed to be made, do you consult him?
21  A  If it's a questionable medical condition,
22  we send the records to Dr. Cooper and he has worked
23  in DOT compliance for several years.
24  Q  Okay. If it's a situation where you're
25  applying a more stringent standard than the DOT

90

1  standards, do you send the records to Dr. Cooper
2  before applying a more stringent standard?
3  A  We could ask for his medical opinion even
4  if the condition is not disqualifying, potentially
5  how it could develop in his medical opinion.
6  Q  You say -- I'm sorry.
7  A  Excuse me, I mean, there is indications
8  where we -- or situations where we would send him a
9  medical report such as that.
10  Q  Okay. You could, but do you?
11  A  Not always.
12  Q  Not always. So sometimes the medical --
13  A  It's still discretionary. Excuse me.
14  Q  The medical, Janice Brown and her staff,
15  make those decisions to apply a more stringent
16  standard on their own?
17  A  In conjunction with Janice's management or
18  supervision.
19  Q  Right, Janice Brown and her staff?
20  A  Correct, excuse me.
21  Q  Okay. What is P.A.M.'s policy regarding
22  pregnant drivers?
23  A  Regarding pregnancy, I'm not sure there is
24  a specific policy.
25  Q  If a driver reports that she is pregnant

91

1  to you --
2  A  Uh-huh. Excuse me.
3  Q  -- or to Janice Brown or to one of her
4  staff, what would be done? What would happen next?
5  A  That would depend largely upon the reason
6  for the report. Just last week we had a driver
7  notify us that she found out she was approximately a
8  month into her pregnancy.
9  Q  Okay.
10  A  And we requested that at the next office
11  visit that the doctor address her ability to safely
12  operate for her and the unborn child. We also asked
13  that her doctor fill out -- review our job
14  description as to whether or not she was currently
15  capable of meeting our minimum physical
16  requirements.
17  Q  Just because she reported that she was
18  pregnant?
19  A  Yes. Well, excuse me, that would be
20  because she is seeking medical treatment under the
21  policy.
22  Q  You're saying -- why couldn't she just
23  have what's normally in a doctor's note that she was
24  not given any disqualifying prescription medications
25  and that she was able to drive?

92

1  A  Her doctor may not be familiar with our
2  job requirements. It's classified as fairly heavy
3  manual labor under OSHA and we want to make sure the
4  doctor is aware of what actually is required of his
5  patient before we return her.
6  Q  So your -- so of this specific pregnant
7  driver, she reported that she was pregnant. Did you
8  allow her to keep driving until her next doctor's
9  appointment?
10  A  After the doctor returned our job
11  description, yes.
12  Q  So until she visited a doctor and returned
13  the job description, she's not allowed to drive?
14  A  I think in this case that she was actually
15  on her time off.
16  Q  Okay. In the scenario where the driver
17  was driving and she learned that she was pregnant,
18  would you allow her to continue driving until she
19  visited a doctor?
20  A  That would depend upon if she was
21  indicating she had problems or how far in the future
22  her office -- her doctor's visit was. You know, it
23  could be a situation where she's done a
24  pregnancy test and just calls to tell us.
25  Q  Okay. So she does a self pregnancy test,

Toll Free: 800.866.5560
Facsimile: 248.205.7040

ESQUIRE
an Alexander Gallo Company

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

93

1 she calls to tell you?
2   A  We would ask her to contact us upon her
3 doctor's visit so we could get the information that
4 we need.
5   Q  Would you allow her to continue driving
6 until the doctor's visit?
7   A  If she felt safe in that case, she would
8 probably be allowed to continue. We've had drivers
9 into their third term continue to drive.
10  Q  And when she went to the doctor -- once
11 she went to the doctor, in order for her to return
12 to driving she would have to have a doctor sign off
13 on your job description?
14  A  Yes.
15  Q  So she would be required to have more than
16 just the standard doctor's note that is required
17 when a driver visits a doctor, correct?
18  A  For a pregnant driver we would like to
19 make sure that, you know, there's no risk to the
20 pregnancy or her because of the physical
21 requirements.
22  Q  Do you require this even if the driver
23 feels that she's okay to drive and perform all the
24 physical functions of being a truck driver?
25  A  I think pretty much we would request a job

94

1 description be completed by her treating physician.
2   Q  Okay. To make sure there's no risk to the
3 pregnancy or to the driver because of the physical
4 requirements?
5   A  Correct.
6   Q  I am going to mark the next exhibit as
7 Exhibit 5.
8       (WHEREUPON, Exhibit 5 was marked for
9 identification.)
10      MR. HOWLETT: Can we take like a two
11 minute break since you're changing topics?
12      MS. GIBBS: Sure. Well, I'm not really
13 changing topics, but, yes.
14      (Short break from 10:39 a.m. to 10:45
15 a.m.)
16  Q  (BY MS. GIBBS) Just before we went on the
17 break we had marked this exhibit as Exhibit 5. Do
18 you recognize this document?
19  A  Yes.
20  Q  Did you write this document on March 7,
21 2006?
22  A  Yes.
23  Q  And for the record, this is an internal
24 risk management document, the review of job
25 descriptions by a treating physician written by Tony

95

1 Longinotti on March 7, 2006 and it was addressed to
2 the medical compliance department. Has this
3 document changed at all since 2006?
4   A  I don't believe it has.
5   Q  At the top, the very top of the first page
6 it says in quotation marks, it says, "This document
7 is intended for self-analysis and correction action
8 only." What does that mean?
9   A  Some attorney told me to put that years
10 ago on any risk management document.
11  Q  What attorney told you that?
12  A  I can't remember who it was.
13  Q  Do you know what that means?
14  A  No.
15  Q  Do you know why you need to put that up
16 there?
17  A  He told me to.
18  Q  Okay. I don't know why it's there. So
19 you just put that little quote on the top of all
20 your risk management documents?
21  A  Yes.
22  Q  Even though you don't know what it means
23 or what it's for?
24  A  He was an attorney. I trusted him.
25  Q  That's a good logic. On the first page

96

1 under methodology, the first paragraph, "After
2 reviewing the current DOT physical and the medical
3 examiner -- and the medical compliance examiner has
4 a legitimate concern regarding the ability of a
5 person to safely perform the over-the-road
6 commercial truck driver physical job specifications,
7 the examiner may request that the driver's primary
8 care physician review and sign the attached
9 documents." Is that what that says?
10  A  Yes.
11  Q  Who is the medical compliance examiner?
12  A  That would be either Janice Brown or one
13 of the other medical review persons.
14  Q  So after Janice Brown or somebody in
15 medical review reviews the current DOT physical and
16 they have a legitimate concern regarding the ability
17 of a person to safely perform the over-the-road
18 commercial truck driver physical job specifications,
19 that person, meaning Janice Brown or somebody in
20 medical review, can request the driver's primary
21 care physician to review and sign the attached
22 document?
23  A  Correct.
24  Q  What are the over-the-road commercial
25 driver -- commercial truck driver physical job


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

141

1      (WHEREUPON, Exhibit 13 was marked for
2  identification.)
3      A   Thank you.
4      Q   Do you recognize these documents?
5      A   Yes.
6      Q   What are these documents?
7      A   I believe these are cell phone records.
8      Q   Cell phone records of what?
9      A   A number of calls taking place between
10  April 16th all the way through May 7th.
11      Q   Okay. Calls from where to where?
12      A   It looks like various called numbers,
13  various locations, and my recollection is these are
14  the cell phone records of Pat Smith and Eileen
15  Bennett -- excuse me, not cell phone, but calls
16  probably made from the terminal, outbound calls,
17  excuse me.
18      Q   All right. These are calls made from the
19  terminal in Parsippany, New Jersey?
20      A   I believe so, yes.
21      Q   And I'm getting that because at the top it
22  says Parsippany.
23      A   I should have read that first.
24      Q   Okay. These were produced to the EEOC in
25  the defendant's response to the EEOC's first set of

142

1  discovery. Did you assist in preparing these
2  documents for discovery?
3      A   I probably attached them in the discovery
4  request, yes.
5      Q   Okay. On the first page it says, EB is
6  written there and then on the next page it says Pat
7  Smith and then on the next page there is two EB's.
8  Did you write those in there?
9      A   Yes.
10      Q   That's your handwriting?
11      A   Yes.
12      Q   Okay. What does EB mean?
13      A   Eileen Bennett.
14      Q   Okay. And what does that mean? Why did
15  you write that in there?
16      A   I think that is information that I
17  received that that was the call she had placed to
18  Anita Phillips.
19      Q   Okay.
20      A   Or I actually could -- I could have
21  transcribed this from an original copy that she sent
22  where she had indicated or highlighted this was a
23  phone call from her, that could have been.
24      Q   You don't know how you determined that she
25  made that call?

143

1      A   I think -- my recollection is the sheet
2  that came in may have just had a highlight figure on
3  it, like a yellow marker drawn through it, and since
4  that doesn't copy well, I would have just written
5  the EB out to the side of it.
6      Q   Okay. So based on your testimony, you are
7  saying based on the information that you received
8  that Eileen Bennett made that call -- Eileen Bennett
9  made that call?
10      A   To the best of my knowledge, yes.
11      Q   All right. And on the next page, are you
12  saying that Pat Smith made that call?
13      A   Yes.
14      Q   And on the next page you're saying that
15  Eileen Bennett made those two calls?
16      A   Yes.
17      Q   Okay. Is there anything on this document
18  that lets us know that Eileen Bennett or Pat Smith
19  made those calls?
20      A   No.
21      Q   So you're saying --
22      A   Other than my reference, no.
23      Q   Okay. And you don't recall where you got
24  the information that you knew that Eileen Bennett or
25  Pat Smith made those calls?

144

1      A   Not offhand, I can't recall.
2      Q   Okay. So based on this document on
3  4-30-07, which would be April 30, 2007, at
4  11:12 a.m. Eileen Bennett called the phone
5  number (313)633-7036, correct?
6      A   It appears so.
7      Q   Okay. Do you know whose phone number that
8  is?
9      A   No.
10      Q   Okay. And Eileen Bennett called that
11  phone number, they talked for eight minutes and 48
12  seconds; is that correct?
13      A   That looks correct.
14      Q   Okay. If you don't know whose phone
15  number that is, why did you indicate that Eileen
16  Bennett made that phone call on here?
17      A   I said my recollection is that the
18  original records came in, had some indication from
19  Eileen that these were the phone calls placed.
20      Q   Placed to whom?
21      A   To Anita Phillips.
22      Q   Okay. So based on however you got this
23  information, you're saying that Eileen Bennett made
24  this phone call to Ms. Phillips?
25      A   Yes. My understanding is this was her

Toll Free: 800.866.5560
Facsimile: 248.205.7040

ESQUIRE
an Alexander Gallo Company

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com

TONY LONGINOTTI                                      September 28, 2010

145

1   cell phone number that they were calling.
2       Q   Okay.  So based on your knowledge, that
3   phone number, (313)633-7036, is Ms. Phillips' cell
4   phone number?
5       A   I believe so.
6       Q   Okay.  And they talked for eight minutes
7   and 48 seconds?
8       A   Somebody did.
9       Q   And the next page which is May 1, 2007 at
10  12:05 p.m, you're stating that Pat Smith talked to
11  Ms. Bennett -- or I'm sorry, scratch that.  That Pat
12  Smith talked to Ms. Phillips for nine minutes and 36
13  seconds?
14      A   What is the day?
15      Q   5-01-07.
16      A   My copy looks like 3.36.  Is that --
17      Q   Okay.  I am going to represent to you that
18  that is actually a nine.
19      A   Okay.
20      Q   But I see -- the copy is bad.
21      A   I will believe you.
22      Q   They talked for some amount of time.  And
23  then if we go to the last page, you are indicating
24  that on 5-1-07 at 6:11 p.m. Ms. Bennett called Ms.
25  Phillips and they talked for four minutes and six

146

1   seconds?
2       A   Yes.
3       Q   And then again at 7:47 p.m. they talked
4   for two minutes?
5       A   That appears correct.
6       Q   Okay.  If we look at -- if we go back to
7   those request to produce documents.
8       A   Which exhibit would that be?
9       Q   Exhibit 1.  And these are marked
10  DTC0000232 through 234, correct?
11      A   Yes.
12      Q   And so these were responsive to your
13  request to produce documents seven?  Page 11,
14  request for documents.
15      A   Number seven?
16      Q   These were part of the -- responsive to
17  that request to produce documents?
18      A   It appears so, yes.
19      Q   Okay.  Number 17?
20      A   Okay.
21      Q   Number 18?
22      A   Okay.
23      Q   And number 19, correct?
24      A   Okay.
25      Q   And then number seven is actually

147

1   documents in support of interrogatory 9D and 9E; is
2   that correct?
3       A   I believe it states that, yes.
4       Q   And those are documents that support --
5   identifying all employees in the medical review
6   department with whom charging party spoke with
7   between April 30, 2007 and May 2, 2007?  D, and all
8   dispatchers with whom charging party communicated
9   between April 30, 2007 and May 2, 2007, correct?
10      A   Yes.
11      Q   If we look at document request number 18.
12      A   What was that again, please?
13      Q   18, on page 14 of Exhibit 1.
14      A   Page 18?
15      Q   Uh-huh.
16          MR. HOWLETT:  No, page 14 you said.
17      Q   (BY MS. GIBBS)  Page 14, number 18, I'm
18  sorry.  Number 18 asked for you to produce any and
19  all documents showing communication between
20  defendant and employee Ray Snapp between April 30,
21  2007 through May 30, 2007, including but not limited
22  to all communications between Snapp and dispatch.
23  And what was provided was these phone records and
24  what was marked as DTC245.  How do these documents
25  show communications between defendant and Ray Snapp?

148

1   Or where in these documents does it show
2   communications between defendant and Ray Snapp?
3       A   It doesn't.
4       Q   It doesn't?
5       A   I don't see that it makes a direct
6   reference between Anita Phillips and Ray Snapp.
7       Q   Okay.  I wasn't asking for Anita Phillips
8   and Ray Snapp.  I was asking between defendant and
9   Ray Snapp?
10      A   Oh, excuse me.
11      Q   So how do these documents show
12  communication between -- where do these documents
13  show communication between defendant and Ray Snapp?
14      A   I can't answer that.
15      Q   Why?
16      A   I don't see a reference to Ray Snapp in
17  the documents.
18      Q   Okay.  And why were these documents
19  produced in response to that request to produce
20  documents?
21      A   Those could have been produced by our
22  operations department or Decker.
23      Q   Okay.
24      A   I don't know.
25      Q   It says the only person that assisted in



Toll Free: 800.866.5560
Facsimile: 248.205.7040

Suite 925
2301 West Big Beaver Road
Troy, MI 48084
www.esquiresolutions.com